Morning, Your Honor. Myron Moskovitz for the appellant, Steve Won. I'd like to reserve two minutes for rebuttal, if I could. There's a number of issues in this case. There were three claims the trial court held that the First Amendment complaint did not state a sufficient claim on any of the three. I'd like to start just with the first one. I think the court was mistaken as to all three of them. The first claim for challenging the foreclosure sale, the district court said, under California law, you cannot challenge a foreclosure sale unless you tender the amount of the underlying loan, which Mr. Won did not do. Well, the problem is, that's not what California law says. California law does say that, when the only thing you're challenging is the technical aspects of a foreclosure sale, for good reason. I mean, if you set aside a foreclosure sale because there wasn't proper notice or something like that, that reinstates the original loan, and if you can't pay it, you've just wasted your time, all right? But California cases say, when that's not what you're doing, when you're not challenged the technical aspects of the sale, you're just wasting your time. So if you can't pay the loan itself, you don't have to make a tender, because if you made a tender and they accepted it, then that would moot out your challenge to the sale. And that's exactly the situation here. Mr. Won ---- I guess I'm not quite understanding what the basis of your challenge to the sale is, then. The challenge to the sale is that the ---- Mr. Won took out his loan to buy his house back in 2001, $244,000. I understand the facts, but what is the defect in the bank's right to do a sale? Mr. Won didn't owe the money. The deed of trust by which Fannie Mae got the property was forged. The imposter who forged it actually paid off the loan that Mr. Won had taken out. He didn't owe Fannie Mae any money at all. That loan was paid off, and on top of that, he was willing to reinstate his original loan, give him an equitable mortgage. He's not looking for a free house. He was willing to pay, but he didn't owe anything. That loan had been paid off. What Fannie Mae was foreclosing on was a subsequent phony refinancing that Mr. Won had nothing to do with. But why didn't Mr. Won bring inaction and equity to set aside the foreclosure sale? Well, he effectively did. It was a quiet title action, which would effectively nullify the foreclosure sale. No, so he didn't bring a cause in equity to set aside the foreclosure sale. That's not what he did. In order to quiet title, you'd have to have title. Right. He had title. He had title to the house. He always had title to the house. That was never taken away from him. He bought the house. He had title. While he was in prison, some imposter forged a deed of trust to the banks that purportedly gave them title, but didn't. They forged Mr. Won's signature. He always had title. He never gave up title. So an action to quiet title is the right thing to do. You know, if you own your house and I come along and purport to sell it to somebody else, I haven't taken away your title. You still have title. And that's what happened here. He never lost title. He never signed anything that gave up title. So an action to quiet title is the right thing to do. Mr. Won doesn't dispute that he owes some money on the house, right? Well, of course he would dispute that. His loan was paid off. He owes nothing. All right? The imposter, when you refinance a loan, you've got to pay off the other one. And that gets paid out of the money that the imposter gets from the lender. Right. Exactly. Why isn't that money that Mr. Won owes and is required to tender? Let's say that he disputes what he claims is a fraudulent amount. Why isn't he required to tender the money that the lender has paid that is, in truth, money that Mr. Won owes? Look, Mr. Won made all the payments. He never did anything to give up title. This imposter comes along, refinances, pays off his loan. He owns free and clear. Nevertheless, in his first amended complaint, he says, I'm not looking for a free house. I will give Fannie Mae an equitable mortgage where I continue the payments that I was able to make that I signed up for. And Fannie Mae said, no, no, we don't want that because we've got a title insurance policy that will give us not the $244,000 that you agreed to pay, but the whole amount, the whole $500,000 that's accumulated that we paid for this phony deed of trust. So we offered it. They said, no, we don't want it. And the offer is still on the table. If they want to take an equitable mortgage, they can have it. They said in their brief, we demanded it. We don't demand it. If they don't want it, fine. Mr. Won will take his free house. But he doesn't owe any money on that house. The imposter paid it. Look, they're trying to blame Mr. Won for all this. Look what happened here. Mr. Won's an ordinary working stiff, right? He runs a limo service. He gets this loan from a bank. He goes in. He borrows the money. He gets sent to prison for a few years. He comes out, and he gets his statement. The loan is increased by 70%. It's up over $400,000. He goes to the bank. He says, what's going on? They said, oh, don't worry about it. We transfer these loans. So he goes home. He keeps making his payments. He didn't stop making his payments. And then a few years later, he goes back in. And for the first time, they tell him there's been refinancing. What? I didn't refinance. What's going on? He immediately goes to a lawyer. The lawyer actually had some experience as a notary. He hires a handwriting expert and finger writing expert who checks out the thumbprint when you notarize something. It's not him. All right? He brings it to the bank's attention. He brings it to Fannie Mae's attention. They say, no, no. We can't rescind the loan because if we rescind the loan without a lawsuit, we don't get all child insurance. That's what happened here. And they're blaming it all on him. I'm sorry. I want to go back to the point that you made that Mr. Wan continued to make payments. It's Fannie Mae's position that Mr. Wan defaulted around 2009. He did. And never made another payment through 2016. Well, that's not quite true. He did stop in 2009. I'm not sure why. It's not in the first amended complaint. All right? But he resumed the payments. In fact, after Fannie Mae brought an unlawful detainer action, there's a stipulation that he would make the monthly payments during this appeal too, and he's still making them. And, you know, this whole time, why are they taking his money if they think he's paying on the wrong amount? And my question for you goes back to 2008, when Mr. Wan was aware that there was this high balance on his mortgage. Right. Why didn't he do anything then? He did. That's when he went to the bank and said, what's going on here? And they told him, well, it's a bank thing. You know, there were some transfers or tranches, something like that, something that was way over his head. And they tell him, we have a fraud department. All right? Well, he doesn't have a fraud department. I don't have a fraud department. You don't have a fraud department. These people are experts, supposedly, in picking up forgeries. They don't even tell him those are refinancing. And now they're saying, and the district court judge said, as soon as he saw that higher balance, he should have known there was a forgery. Well, how can he know there's a forgery if they don't even tell him there's been refinancing and they don't show him the papers? They had that in their file. Hold on. Yeah. It's not that he should have known that there was a forgery. It was that it put him on notice to do additional investigation to figure out what was going on. Because if he didn't do anything, right, and you're making your payments every month, the way that you're supposed to be making your payments, then the balance should be going down. And if the balance isn't going down but instead going up, then it is incumbent on the borrower to figure out what is going on. And you need to do some investigation. Right? Like what? I mean, this is an ordinary person, a layperson. Counsel, what would you do? What would you do if you get your statement and you look at the statement and you see that the balance is going up? Well, no, the balance went up after the three phony deeds of trust, and then I assume it would go down when he made his payments each time. But it's going down from a much higher amount. Exactly. All right? And they're not changing it. But, look, they're taking my payments every month. They're not, well, they did send in 2010 a notice of sale, but that passed. They never did anything about it. He finally goes back in there in 2013, and for the first time they tell him, oh, there's been these refinances. And he immediately goes to a lawyer and says, I didn't refinance. What's this all about? I mean, who's got the expertise here? You go to a bank. You go to a doctor. You go to an airline. I mean, who do you expect to solve these problems? You? I mean, what do you know about the internal workings of an airline or a bank or an insurance company? I mean, these are ordinary consumers, and they're supposed to be taken care of. Fannie Mae's guidelines for their servicing agent says you take care of your customers. You investigate fraud. That's your job. The bank's job. That's not the customer's job. He doesn't know anything about that. Well, until the client says there is something going on here that you need to investigate. Because I didn't do this. No, he did it as soon as he found out something he knew was false. Refinancing. He went immediate to a lawyer. The lawyer immediately hired a forensic expert to find out that that wasn't his. Earlier, I mean, who hasn't gotten a statement from the PG&E or a bank that's off even a lot? And what do you do? You go in there and say, we've got a problem here. I think you got me mixed up with another accountant or something. And the banking official told him, yeah, I think that's what happened. We'll check it out. And he didn't do anything wrong here. And the upshot is now he owns his house. He never gave up title. The loan that he took out happened to have been paid, but he's willing to reinstate the payments. But this is his home that he lives in, and he never did anything to give up title. And now Fannie Mae claims they have title. They don't have title. I mean, it's really that simple. And, I mean, how can you take away somebody's property when you got some crook out there who's forging these deeds of trust? And now the bank has a – I mean, what happened when this guy first took out the phony loans? Did they check his signature against Mr. Wan's signature on file? Did they check his fingerprint? You know, it's totally irresponsible what these banks did. And what Fannie Mae did, they knew about these forgeries when they brought the second unlawful detainer. It's outrageous what these financial institutions have done to a little guy. Thank you. We'll hear from the other side. Good morning, Your Honors. May it please the Court. My name is Fred Burnside. I'm here representing Fannie Mae, along with Joe Addiego and Mr. Wexler. Are you all representing Fannie Mae? Correct. And Fannie Mae is the only defendant? Correct. Plaintiff seeks to quiet title on real property that he pledged as collateral for a loan he admits he never paid back. Plaintiff knew in 2008 that his loan balance had gone up by 68 percent and was owed to a new lender. If the District Court correctly held in this case, that massive increase would put a reasonably diligent person on notice that something was amiss. In 2010, February, plaintiff got a notice of trustee sale. The significance of that is that triggered his undisturbed possession of the property and the limitations period for a quiet title claim. Plaintiff's claims were thus barred because they expired at the latest in 2014. I want to focus my argument today on the quiet title claim and the identity theft claim. And I want to touch on a few of the relevant facts and explain in more detail why both claims are barred. Focusing on the Washington Mutual loan in 2007. Remember, plaintiff got out of prison and was in a halfway house and then got out of the halfway house in June of 2007. The next month, he's getting statements from Washington Mutual and he pays those statements. It's a new loan amount and a new lender. And the deed of trust is Mr. Moskowitz goes on and on saying they should have known. That's why these things are notarized. They had no reason to believe there was something amiss with a properly notarized deed of trust. Nothing would put them on notice to somehow do his investigation for him. So what does he do? He makes payments for 17 months on the loan, at least. And then he contacts Washington Mutual in 2008 and says, well, what's going on with my loan? And they say not, oh, you know, they had no obligation to tell him it was a refinance because they had no reason to believe he didn't know it was a refinance. And what they tell him is look at your loan terms. He knew his loan terms. He attached the deed of trust. They know that he, did they think that he had refinanced it? Well, I mean, from their position, it's from a different lender, right? So they're just issuing a new loan on a piece of property. And so ultimately he could have looked at the adjustable rate rider and his deed of trust, which is in the record, and said, okay, I borrowed X amount of money, pulled out a calculator. How much should I be paying? This isn't right. Say that again. His deed of trust. Why they shouldn't know that he hadn't financed it. Oh, they shouldn't know that. I mean, they have a, that's the reason you notarize instruments that are recorded, is because it's presumptively valid under the California Evidence Code that a notarized document was signed by the person who appeared before the notary. With that in hand, they have no reason in 2007 or 2008 to think there's anything amiss with this loan. They shouldn't have been thinking Mr. Juan took out this loan and he's calling about his loan balance. That happens all the time with people, and they've taken out legitimate loans. There's nothing to put them on notice there's something amiss. So we knew in 2007. Who signed the, whose notarized signature was it? I mean, whoever, I don't know the name of the notary. Oh, no. Whose signature did the notary? It says Stephen Juan. It says Mr. Juan. And so he claims now that maybe that wasn't his signature, but he could have obviously authorized someone else to sign on his behalf with the power of attorney. But ultimately it doesn't really matter because he knew in 2008 he had this new loan balance. You can't authorize somebody to sign for you in your name with the power of attorney. They might be able to sign their name for you. Yes. Correct. But you said it said Stephen Juan. Right. You're absolutely right, Your Honor. So that statement is just not right. Yes. Okay. That's correct. As to, and the earlier deeds of trust aren't in the record, but that's exactly what happened. Ultimately, in 2009 he defaults. Okay. And what's significant about that timeline is he also concedes he asked for a loan modification from Chase. And that's an acknowledgment of the debt. And what's notable is, and this is at docket 19-1, which was mistakenly omitted from this. Didn't he notify them that the amount was way more than he had borrowed? Yeah. I mean, he alleges he contacted them and said, why is my loan balance so high? And they said, look at your loan terms. I mean, I don't know, you know, that's exactly what should have triggered his investigation. He did nothing for eight years. What is your version of what happened here? You know, I mean, on this record I can't really speculate, you know, as to what happened. But ultimately a loan was taken out. It was properly notarized. It was recorded. It was a lien on the property. It paid off the prior lien on the property. What was, what loan are you talking about? The Washington Mutual loan. And it was properly notarized when somebody signed, when somebody who signed his name? I mean, it's presumptively, it's presumptively accurate under the California Evidence Code, yes. That's why we have no reason. You're pretty sure it wasn't him. But it wasn't him. No, no. But presumably whoever it was, if it wasn't him, presented some identification of some sort, you know. Did Washington Mutual or Fannie Mae collect on the title insurance? I don't know the answer to that question. I don't think a title insurance claim has been offered because Fannie Mae has title. Fannie Mae owns the property. They got a trustee's deed that says you own this property. But I want to get back to the. . . But have they, what is the status of the property right now? Fannie Mae has title to the property by virtue of a trustee's deed. And have they foreclosed or not? That's why, I mean, they have title because there's been a foreclosure, yes. That occurred on September 11th, 2013. But Mr. Wynne is still occupying the property. Is that correct? It is. It is because they decided to stay, in essence, that litigation pending this litigation, and he's basically paying rent in the property now. So they foreclose, and what do they get in the foreclosure sale? They get a trustee's deed that says you've paid $558,000 for this property. Title is vested in your name. So they have whatever deed was there, right? Correct. And if they want to, I guess if they foreclose, they can sell the property and get the loan paid off that way. Yes. But they haven't done that yet. No, they haven't done that yet. It's been ongoing. But I do want to get back, you know, in May of 2009. . . If the deed was forged, then there would be a claim against the title insurance, right? Possibly, yeah. Yeah, I think that's right. And the reason, Your Honor, this is just like the Salazar case that both sides cited. And why isn't Fannie Mae willing to make a claim against the title insurance if we're pretty sure that this was a forgery? This is exactly the thing that . . . Well, we aren't pretty sure that it's a forgery. He says that, but, you know, that's not an issue that's currently before the court. And second of all, Fannie Mae, you know, he talks about this equitable mortgage. Fannie Mae doesn't make loans. It buys loans. Fannie Mae can't give him an equitable mortgage. It has no ability to give him an equitable mortgage. It has no ability to what? To give any kind of mortgage to him because Fannie Mae isn't a lender. It's a purchaser of loans other lenders have made. Let's say that they tried to sell the property and it's worth much less than the deed. Would Fannie Mae have a claim against the title insurance? No. Why not? I mean, if it's market value . . . . . . to a trust deed that, let's say it is, in fact, forged. I mean, you know, the thumbprint doesn't match, right? And this is forged. They wouldn't have recourse against the title insurance? Well, in that situation, I misunderstood your question, Judge Kaczynski. I apologize. I thought you were saying if they eventually sold the property for, you know, a reduced value because of the market, then, no, they wouldn't have a claim. But if the deed is, in fact, you know, forged, they may well have a title claim. Mr. Wexler is the one who's better suited to handle title-related questions on that issue. But . . . So I'm having trouble understanding why if there's insurance against this risk, and, in fact, this risk came to pass, why this should come out of Mr. Wanshide. Because he waited too long. He waited eight years. This is just like the Salazar case. Exactly like Salazar. That's such a loyally thing to say. I can't help that, Your Honor. I mean, the fact of the matter is it's . . . On the one hand, I want to read to you . . . It's not too late to make a claim against the title insurance, right? I don't know the answer to that question. I don't know the answer. Would you like a file supplemental briefing on that? You know, potentially, but I don't think it's relevant to the bases that the court . . . Well, maybe you don't think it's relevant. At page . . . at ER 38 . . . If there is, in fact, a fraud in this case, and if the fraud . . . I mean, this is one of the risks insured against when you buy title insurance. Why shouldn't Fannie Mae pursue that claim rather than have Mr. Wan kicked out of this house? Because Mr. Wan borrowed money that he hasn't paid back and pledged his home as collateral for that loan. Fannie Mae paid $558,000 for that, and, ultimately, he waited too long. They have no reason to believe . . . This was my question of what is your version of what happened here. Is it your position that he was the one who refinanced it? You know, on the allegations of the complaint, I can't refute his allegations. He says he didn't, Your Honor. But, ultimately, you know, do we think there was a valid lien? Yes. You know, I don't think he's proved anything. Saying I didn't do it after acknowledging the debt . . . If we were to send this back for trial on one theory or another, what would your position be? That he refinanced it? I mean, we'd need additional discovery, but, you know . . . Presumably, I think we'd have to . . . You know, one of the arguments we'd make is that it's him. Yes, absolutely. Plaintiff's counsel . . . Wasn't he . . . Was he in prison when this happened? He was in a halfway house when this happened. So, when the refinancing occurred . . . Yes. And, the documents were actually signed. He was in a halfway house at that time? Correct. Okay. Yes. And, you have the name of the notary? I believe it's in the record. It's probably . . . Well, I don't know if it's in the record or not. But, I mean, he does attach the report from his forensic investigator that says, I receive what appears to be the notary's logbook on this loan. We haven't done discovery or investigated those facts. So, that's his representation. And, has anybody compared the signature on the refinancing documents with the signature on the original loan? I mean, I have. But, you know, I'm not sure I get to testify in the Court of Appeals. I mean . . . Right. But, I guess my question was, during discovery, did anybody . . . No, it didn't get that far because it was dismissed on a motion to dismiss. Okay. One point, I know I'm over time, but with the Court's indulgence, I want to address a point that Mr. Moskowitz raised. He argues he shouldn't have to tend to the debt because he disputes the validity of the debt. He doesn't dispute the validity of the debt. He disputes the identity of the creditor. At page . . . at ER 38, plaintiff said, in response to this motion to dismiss before the Court, plaintiff is not without awareness of the underlying debt and does not want to use this situation to obtain a windfall. That's exactly what he is asking for because his complaint says it would be unfair and unjust to quiet title in this property or moving all lien if he had to pay any amount, even the original loan balance. And that is not fair. He's, in essence, seeking to profit from the identity theft at the expense of Fannie Mae. Quiet title is an equitable claim, and that is not equitable. No, that's not quite what he says. I mean, he says he's willing to accept the debt that he signed for. There is no court of appeals or Supreme Court decision anywhere that has said, in a quiet title action, you don't have to tender. And he says I can't tender the whole amount. It may be true, but it's really not fair of you to characterize his position as wanting to profit from this. This has just not been his position at all. I mean, you're just trying to make him out to be a bad guy. No, Your Honor, if you bring a wrongful foreclosure claim . . . He stood right here and says, look, he's willing to accept the original debt. It's in his papers. So it's really not fair of you to do that. It's probably necessary and just makes me suspicious of why you think you have to make such overwrought arguments. Because, Your Honor, I think it—I don't want to get into a debate, but what his lawyer stands up and says, there is no money. Even though I borrowed the money and I haven't paid it back, there's no loan. There's nothing I have to pay back. And what he says is, but I'll accept an equitable mortgage from an entity that doesn't have the ability to give me one. I think that is unfair. I think that he says in his complaint . . . But that can be arranged. I mean, you can get a bank to issue a loan in that amount. I mean, this can be worked out. That's why there are lawyers involved. If Fannie Mae were willing to do that . . . Fannie Mae can't do that. Can't issue a loan. No, can't issue a loan. Can't go to a bank and get a loan or can't help him get a loan. On his behalf, you know, a twice convicted felon, I mean, it could be hard. I'm not saying he would qualify for a loan for the value of the property that he would need. I'm sorry? I don't know if he would qualify for a loan. Ultimately, the limitations period ran in this case in 2014 at the latest on both the quiet title claims and the identity theft claims because he knew then that there was a new lender with a 68% increase in loan amount that put him on notice that something was amiss. And it was his obligation to investigate, and he didn't. This is just like the Salazar case where they alleged a forged note and a forged deed of trust. Went to the court of appeals and said, the defendant said, wait a minute, we issued a notice of default and that put them on notice and started the clock. And the court of appeals said, you know what, a notice of default doesn't start the clock because that's just saying you have to pay this to get out of default. But a notice of trustee sale, that's putting someone on notice that sale is going to occur. That does start a limitation period. It's dicta, but it strongly suggests that does start the limitations period. And the Huang case and the Johnson case from this Court that we cited in our 28J letter says the same thing. Okay. Thank you. Thank you. You're out of time. We'll give you a minute for rebuttal. I'll keep this short, Your Honor. I hope you're also brief. Pardon me? I hope you'll also be brief. I'll be very brief. Not just short. Your question about title insurance, on page 18 of our opening brief, we quote Fannie Mae's attorney. This is after they dismissed the first unlawful detainer action when Mr. Huang's attorney told them, you've got to check out this forgery. And they said, you know, we supplied them with the experts, forensics examination. And what do they do? They come back. They say they're not going to rescind the sale. And here's the language they used. That Fannie Mae did not question Huang's claim that the deed of trust was forged, but they refused to rescind because, quote, until Fannie Mae's title is stripped or challenged in a civil suit, the title insurance company will not come in. All right? So they can't collect unless they lose this case. That's what they're saying. That's why they pursued it. And if they do lose this case, they're going to get the whole $500,000. Mr. Huang is offering to reinstate the original loan, which is only $244,000. They don't want that. No. They want all the money from the title insurance company. So I guess they've got to put up as good a defense here as they can. But keep in mind, this comes up on a 12b-6 motion. What are they doing? They're trying to try the case here. In their brief, they say that forensic analyst, his report is fabricated. Now, you're not supposed to try a case on a 12b-6 motion. If they want to claim, as there was a suggestion here, Mr. Huang was at fault, fine. Let them try to persuade a jury. I think a jury would find the banks are at fault. Fannie Mae is at fault. They've got a responsibility to their customers. They didn't meet here. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Schroeder, Kozinski, Ellis